IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Hesai Technology Co., LTD,          )
et al.,                             ) Civil Action
                                    ) No. 24-cv-1381
                    Plaintiffs,     )
                                    ) MOTION HEARING
vs.                                 )
                                    ) Washington, DC
United States Department of         ) March 20, 2025
Defense, et al.,                    ) Time:  1:42 p.m.
                                    )
                    Defendants.     )
_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE JUDGE PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For Plaintiff:      James E. Tysse
                    Lide E. Paterno
                    Caroline Lewis Wolverton
                    Akin Gump Strauss Hauer & Feld LLP
                    2001 K Street, NW
                    Washington, DC  20006
                    (202) 887-4000
                    Email:  Jtysse@akingump.com
                    Email:  Lpaterno@akingump.com
                    Email:  Cwolverton@akingump.com

For Defendants:     Daniel Riess
                    Kristina Ann Wolfe
                    U.S. Department of Justice
                    1100 L Street, NW
                    Washington, DC  20005
                    (202) 353-3098
                    Email:  Daniel.riess@usdoj.com
                    Email:  Kristina.wolfe@usdoj.gov

_____

Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                         Official Court Reporter
                         202-354-3267

\* \* \* \* \* \* \*P R O C E E D I N G S\* \* \* \* \* \* \*

THE COURTROOM DEPUTY:  This is civil action 24-1381, Hesai Technology, LTD, et al. versus U.S. Department of Defense, et al.

Counsel, please approach the podium and state your appearances for the record.

MR. TYSSE:  Good afternoon, Your Honor.  James Tysse on behalf of Hesai Technology.  I'm here with my colleagues Lide Paterno and Caroline Wolverton.

THE COURT:  Good afternoon.

MR. RIESS:  Good afternoon, Your Honor.  Daniel Riess for the defendants, here with my colleagues Libby Finelsen from the Department of Defense and Kristin Wolfe from the Department of Justice.

THE COURT:  Good afternoon, everybody.  It's a very interesting case.  I've read the papers quite carefully and the statute and I think I'm ready for this argument.  There's still a lot of questions.  So you sort of agreed on 35 minutes a side.  I won't hold you to it.  You'll keep time for rebuttal and surrebuttal, since there are cross motions for summary judgment.  And you all have agreed that the defendant, the Department of Defense, will go first.

So ready to hear from you, Mr. Riess.

MR. RIESS:  Thank you, Your Honor.  And may it please the Court.

THE COURT: Yes, sir.

MR. RIESS: Your Honor, you've asked the parties to address four sets of questions. I will answer those questions and then I'll reserve the remainder of my time for rebuttal, or I can address plaintiff's responses to those questions and the other issues that they might raise.

With the Court's permission, I thought the best approach would actually be to answer the questions in reverse order; four, three, two, one.

THE COURT: Whatever order you want. They were just -- you can each approach it any way you want to. I just wanted to focus the argument on the things that were concerning me.

MR. RIESS: Understood, Your Honor. Thank you. Our responses to the even questions will be relatively lengthy and the ones to one and three will be relatively short.

So the first question related to due process. So the bottom line is Hesai is not entitled to pre-deprivation due process. That's because of the general context we have here, which is national security and foreign policy. And it's because of the specific danger here, which is compromising the United States' military supply chain. And the *People's Mojahedin* case, which I'll call *PMOI*, is inapposite here. So let me address those.

*Mathews* itself notes that due process is, of course,

a flexible concept that requires procedural protections such as the situation arises.  So let's take the three *Mathews* factors. The first is the private interest.  Now, to trigger *Mathews* balancing in the first place, the private interests has to be one that's cognizable under the due process clause.  But as we explained, plaintiffs haven't shown that they have a cognizable liberty or property interest or one that's ripe, and that's for three main reasons.

So, number one, the cases they cite to show there are two ways you can show a Fifth Amendment constitutional injury under a stigma-plus argument.

THE COURT:  Slow down just a little bit.

MR. RIESS:  Thank you, Your Honor.

Constitutional injury under a stigma-plus argument. So those cases, those were about following a chosen trade or profession, an individual doing that, or a government employee or a government contractor who lost a government contract or employment opportunities.

So for the first of those, interference with an individual's right to follow a profession, Hesai is obviously not an individual, and I haven't seen any authority that an entity has a right to follow a chosen trade or profession.  As for the second, this isn't about losing a government contract or losing government employment, and so that line of cases is inapposite.

Now, the second line of cases that plaintiffs cite is sanctions cases. Those, including the *PMOI* case and the *National Council of Iran*, are inapposite. I'll go into those in a moment. But just let me say, they're a far cry from the very harsh sanctions in those cases as what we have here.

And, number three, the harm to reputation cases. So it's well-established that in and of itself harm to reputation, that's not enough to show constitutional injury for due process purposes, it has to be stigma-plus. Plaintiff cites the *Ralls* case from the D.C. Circuit. That was, though, about fully-vested property rights. And here, we've explained, for due process purposes plaintiffs have, at best, a contingent interest in the -- in what they say is their ability to raise capital and solicit investment or their reputation and goodwill. So for those three reasons, and also the fact that it's an unripe due process claim, that's the private interest.

Now, *Mathews* factor two, the risk of erroneous deprivation. So the Department of Defense has established an agency reconsideration process. Entities have a full and fair opportunity to respond to being designates.

THE COURT: So basically after the designation there is an opportunity for reconsideration and that provides, after the fact, due process?

MR. RIESS: Correct, Your Honor.

THE COURT: And presumably, if you are persuaded on

the motion to reconsider, you'll reconsider and change your decisions in some cases?

MR. RIESS:  That has happened, Your Honor.  The DoD has decided not to redesignate more than one entity based on evidence that they've received during the reconsideration process.  So in that process entities can present whatever information they want to, DoD reviews those.  And this is a procedural safeguard.  It's meant to try and mitigate against any risk of erroneous deprivation.

Now, plaintiffs here have availed themselves of that process.  DoD has, let's say, thus, they've just not found its evidence compelling.  So that's the second factor.

Now, the third, the public interest factor, that really shows here that there are compelling reasons for post-deprivation instead of pre-deprivation process, and I'll explain.

So, Hesai itself cites the *Holy Land Foundation* case in its briefs.  I'm talking about the District Court case now, not the D.C. Circuit.  That case says you can have post-deprivation process if there are three things, and we have all three here.  I'll go through them one by one.

So, number one, deprivation is necessary to secure an important government interest.  We have a compelling government interest here, Your Honor, it's § 12H -- 1260H, furthers the interest of protecting the supply line to the U.S. military by

preventing infiltration from foreign adversaries.  I'll explain.

So the concern about Chinese military-civil fusion that's motivating the statute, it isn't so much we're worried about China getting ahead of us militarily, the concern really is we receive so many goods from China, we have to protect the government supply chain from a specific threat.  And the threat is we buy components like LiDAR, like computer equipment, like drones, and if those can collect and pass on information to unknown sources, including foreign adversaries, and then if we incorporate those components into our military apparatus, ships, tanks, aircraft, that --

THE COURT:  Some of them also have commercial uses as well, right?  Some of the things that come in from China have both commercial and military uses?

MR. RIESS:  Yes, Your Honor.

THE COURT:  How is that -- I mean, I know you're going through the factors here, but one of the questions I put was:  What do we do about dual-use?  Dual-use items that, you know, I'm buying, you know, an LED battery or something like that or something for my computer at home, it may be the same product that's also used in a submarine.

MR. RIESS:  Sure.  So I guess there's a few responses on that, Your Honor.  I guess, number one -- I mean, there's a common sense difference between, on the one hand,

advanced-laser technology, and on the one hand there's things like paper, like canned goods, like things that both the military and the civilian sectors use because everybody uses it.  So DoD really isn't going after those latter things, it's focusing its attention on dual-use that have serious national security concerns.

It really doesn't have the bandwidth to go after, sort of, everyday products.  And it's not as if this is -- I mean, there are about, I believe, around 45, 50 entities on the most recent list, so this is not really a concern.

Plaintiffs have said -- let's see -- I think, that there's no limiting principal.  I think that argument doesn't work here for a few reasons.  So, number one, the *TikTok* case. Both the D.C. Circuit and the Supreme Court both made clear the well-established principle, the political branches don't have to attack the problem all at once, they can go case by case and they can focus on the most serious concerns first.

*TikTok* said this applies in the national security context, too.  Just because you point to some other platform that the government isn't going after, that doesn't mean we don't have a national security concern in going after you. That's number one.

Number two I'll explain in more responses to the Court's third question.  But, DoD focuses its efforts on entities that implicate 1260H in multiple ways.  So, for

example, an entity that both resides in an enterprise zone and receives tech-related assistance from the Chinese government. So here, as we've explained, DoD has information showing that Hesai belongs on the list for multiple reasons, and that's its MO.  So as in *TikTok*, DoD had, quote, good reason to single out Hesai for special treatment.  That's number two.

Number three, as I mentioned, DoD's focus is on significant substantial risks to national security.  So whatever else the statute might apply to, it certainly applies here.  We have an entity that significantly contributes to advancing Chinese military-civil fusion, it allows China to dominate the market in LiDAR and autonomous vehicles.  And we have evidence that that raises profound national security concerns because, as I mentioned, it allows -- it makes it more likely that Chinese LiDAR products can enter the U.S. supply chain and, specifically, the U.S. military supply chain and gather and share information with a foreign adversary.  That is the real concern.

So just finishing up on the post-deprivation.  The concern about military equipment becoming compromised, I mean, that isn't just a threat to military equipment, of course, that threatens the safety of our personnel in the armed forces.  It makes it hard to prevent harmful data collection.  I mean, that was what *TikTok* was about.  If you get a component from a bad actor embedded in a weapons system or an aircraft, it's hard to

locate and remove that.  Even if they do locate and remove it, there could be harm.  And say, like, the Air Force finds that computer chips that are used in making aircraft were from a Chinese military company, it has to ground that aircraft while it assesses the national security risk.

So that's the compelling interest and that is number one of why its post-deprivation process is appropriate.  It's necessary to secure an important governmental interest.  The other two factors that are mentioned in the *Holy Land Foundation* apply here, too.

So, number two, there's a special need for very prompt action.  I'll explain.  So to protect the government supply chain, starting in 2026, if you're on the 1260H list, you can't get a DoD contract, you can't get a DOE grant, you can't get a CHIPS Act grant.

Now, if an entity were told in advance we're considering listing you, then that gives that entity time to try and take countermeasures to try and avoid this, like spinning off assets to create a new entity, like creating a brand new entity and obscuring who is the real owner of that entity.  So in the interim --

THE COURT:  In the experience the DoD -- I mean, are these hypotheticals that are realistic?  I guess it's a question that may be hard to answer because the experience of DoD, if everybody agrees you're not entitled to pre-deprivation

notice, then the situation may not have arisen.

MR. RIESS:  That is the case.  We have had, Your Honor, instances where both the entity and China have come in after the designation and deliberately scrubbed the internet and also have tried to, you know, make it more difficult -- they've tried to expunge evidence that, you know, that DoD relies on, and that's the real concern about pre-dep notice, that if you tell an agency, well, we're thinking about this, in the interim they're free to still enter into DoD contracts, they can pass along components to a DoD contractor while the designation is ongoing.

So that's -- I mean, that's what's really motivating the calculus here in favor of post-dep process.

THE COURT:  In your arguments that you're making about the sufficiency of post notice, post opportunity to be heard, due process really flow from *Mathews* and *People's Mojahedin* or distinguish them?

MR. RIESS:  So the factors that I'm just reciting, those three factors are from a case called *Holy Land Foundation*.

THE COURT:  Oh, I remember *Holy Land*.

MR. RIESS:  That's 219 F.Supp.2d 57.  So, necessary to secure an important -- here, a compelling government interest, the special need for very prompt action.  And I'm pretty sure it predates that case.  It was just applied in that

case to the national security context.

And I'll just note for the record, on page 19 of the record, end note 3, we have newspaper articles showing how China security agencies do scrub the internet of unwanted info. So that's not just something we're hypothesizing. There is evidence.

THE COURT: I've seen the articles.

MR. RIESS: Okay. The third factor under *Holy Land* is a government official has to find under the standards of a narrowly drawn statute that the deprivation was necessary and justified in the particular instance. That's the third factor justifying post-deprivation process.

Here, it's the deputy secretary of defense, him or herself, that signs off on the 1260H list. So the second highest ranking official in DoD is responsible in finding that it's necessary and justified in the particular interest. So as I'll explain, too, when we talk about *Luokung* and *Xiaomi*, 1260H is a narrowly-drawn statute, more so than 1237, which was at issue in those cases.

THE COURT: An issue in what? In Judge Contreras's case.

MR. RIESS: Yes, yes.

THE COURT: It's a different statute.

MR. RIESS: It is a different statute, § 1237, which is now defunct. So for all those reasons, it's a post-

deprivation process that is justified and necessary here.

Now, I don't want to leave without addressing the *People's Mojahedin* case. You specifically asked about that. So on the due process it's inaccurate -- it's inapposite, excuse me.

THE COURT: You don't want to call those three judges on the Court of Appeals inaccurate.

MR. RIESS: I do not want to do that at all.

It's inapposite for three reasons, Your Honor. So, number one, it was applying the D.C. Circuit's prior opinion in the *National Council of Resistance* case. I'll call it *NCRI*. And in that case it emphasized the seriousness of the consequences of the determination. And they weren't kidding, the consequences were harsh. All U.S. assets of the organization frozen. All organization members can't enter the United States. If you help the organization with a material support, you could be prosecuted. That's obviously not what we have here. You don't lose your assets, your members can enter the United States, people who help you aren't prosecuted.

So there is a future restriction on bids on DoD contracts, there's current restrictions on benefits from DOE DHS, CHIPS Act. But, you know, it's a very far cry from the consequences in the *PMOI* case.

Number two, the *NCRI* case specifically allowed for, quote, notice after the designation where an earlier

notification would impinge on U.S. security and foreign policy goals.  So we have shown here that, in fact, it would impinge on those goals.  That's number two.

And, number three, and last, *PMOI* is limited to specific context of the designation of foreign terrorist organizations under AEDPA the Antiterrorism and Effective Death Penalty Act.  Other designations, notably, do allow for post-dep process, most notably, OFAC and the Kingpin Act designations.  In fact, in the --

THE COURT:  In which designation?

MR. RIESS:  The Kingpin Act.  The foreign narcotics Kingpin Designation Act.

So in the due process case that we cited, *Lopez Bello,* the District Court said that, "The D.C. Circuit has held due process is satisfied in cases involving OFAC designations by a post-deprivation remedy."  This is all -- all of this is 651 F.Supp.2d at 40.  It also said, "This Court and other members of the court have routinely rejected the contention that procedural due process rights are violated when pre-deprivation notice wasn't provided."  And, last, it said, "The government doesn't need to provide pre-dep notice under OFAC because of its compelling national security and foreign policy interests, while minimizing the potential for asset flight."

So as we've explained here, there are similar compelling concerns that justify post-dep process.  That

distinguishes the *PMOI* case, in our view.

So that was number four, Your Honor.  And going in reverse order, the question three was about the four separate subparts of § (d)(2) of the statute.  It probably is most helpful to have the statute while going through this.

The answer to the question --

THE COURT:  I have my little -- as I've been reading everything in this case, I have this two-page document which has 1260H(d)(1) definition and then 1260H-(2) definition of military-civil fusion contributor.

MR. RIESS:  So answering the Court's question under question three, it is sufficient for the Court to find that DoD has met its burden as to any of the subparts under (d)(2).

THE COURT:  Which is your strongest case?  Or don't you want to choose?

MR. RIESS:  That's a difficult question, Your Honor. I think if -- I think, since any of -- I mean, we have four, and I think if there is -- if there is substantial evidence under any of those parts, I think it suffices.  The statute does here specifically say that military-civil fusion contributor includes any of the following.  So if there's -- you know, all it is if there's substantial evidence to support a finding under (d)(2), and then you've also satisfied (d)(1)(B), that's all that's necessary here for Hesai to remain listed.

Now, I want to caution, though, in practice DoD's focus is on situations where, like here, an entity is more than one type. Under (d)(2) there's more than one type of fusion contributor, and that makes sense. The idea is we don't want to chase after, you know, things that don't pose a national security risk. So one strand in isolation, okay, maybe there is an innocent explanation. But if you twist that strand with other strands, it becomes a rope.

So if there's just one source of information indicating that an entity is one type of contributor -- again, maybe there's an innocent explanation, but once you see evidence that an entity is going within multiple categories, an innocent explanation seems a lot less likely.

Now, that's what we have here. To be clear, if an entity is just one type under (d)(2) but the evidence is particularly strong, there's multiple sources of info, DoD wouldn't rule that out necessarily, but its MO, its practice here has been we look at situations where there's more than one finding under (d)(2). So that was question three.

THE COURT: So that's really not -- I know we're going to talk about -- we're talking about substantial evidence, but if what you've just said is not really a statutory construction argument, that it's a practical application of the statute, right?

MR. RIESS: Correct, Your Honor. Yes.

THE COURT:  So that's how it works in the real world, but for terms of -- for you to prevail in this case, the statute says any of the following and lists what? eight, I think, and there are four that are discussed by both parties in this case.  Four of those eight.

MR. RIESS:  That's exactly correct, Your Honor.  Yes.

THE COURT:  Okay.

MR. RIESS:  Okay.  So on question two, which was about dual-use products, we've touched on this a little bit.  I think the best way to answer this question is, honestly, to show you how DoD applied this language in this particular case and then I think I can explain why the concern of Judge Contreras in those cases isn't relevant here.

So in an abundance of caution, DoD here did find under (d)(1) that Hesai is a contributor to the Chinese defense industrial base.  And because those words aren't defined, each word bears its plain meaning.  Now, I'm aware that Hesai argues that "defense industrial base" is a term of art.  I don't think that that's persuasive, though.  That's because Hesai's examples, they're all about the usage of the phrase "U.S. defense industrial base."  That really makes a difference.

The relationship between, on the one hand, the Chinese government and its defense industry is markedly different from the one between the U.S. and its defense industry.  It's a matter of control.  It's -- I mean, it's well

known, China can tell, ostensibly, private businesses this is how you run your business, this is what you produce, and if you don't comply, we shut down your operations in China.

So I don't think you can just transpose the notion of a U.S. defense industrial base onto China. And so that means under principles of basic statutory construction, each word bears its plain meaning. Contributor to the Chinese defense industrial base. So we can take those.

Contributor, that doesn't just mean providing material or supplies to. Contributor. People contribute intangible things. They contribute their time, they contribute their labor, they contribute to achieving a goal, I think. Defense and industrial, I think those words are pretty straightforward. Base, basic elements. Infrastructure, as opposed to superstructure.

So, for this we ask: Did Hesai contribute to the basic underlying elements of China's defense establishment as they relate to industry? Yes, it did. And this is all in the record, this is at 1715 to '16.

THE COURT: It's what?

MR. RIESS: I'm sorry. The administrative record at pages 1715 and 1716.

THE COURT: Got it.

MR. RIESS: So to summarize, it's a contributor to the Chinese defense industrial base because its development of

advanced LiDAR technology significantly contributes to furthering China's goal of military-civil fusion.  Developing autonomous vehicles is crucial for the People's Liberation Army.  At the front line of this race is to try and -- the Chinese attempt to try to dominate the market for LiDAR.  And we have documents from China showing that there was -- numerous government origins were directed to the surge aide for intelligence vehicles around the 2020 timeframe.  That aligns with what -- the actions we've identified for Hesai here.

Around that timeframe U.S. companies had control of the LiDAR market, but Chinese companies, through subsidies and other support, dethroned the U.S.  And this has profound national security implications because if China dominates the market, it makes it that much more likely that, as I mentioned before, Chinese LiDAR product can enter the U.S. government supply chains and gather far more personal data than consumers realize.  That was what motivated the concern in *TikTok*.

So let me turn to Judge Contreras' opinions here and explain why I don't think that they are relevant.  The bottom line, though, is those were construing different language in a different statute, 1237, now defunct, with much harsher consequences.  And critically, that statute never mentioned military-civil fusion.

But I want to back up before I address Judge Contreras's specific language to talk about the context.  So,

two things.  First, he was asking if those entities, Xiaomi, Luokung, were affiliated with any ministry of the government of the People's Republic of China.  Here it's much more limited, we are just asking if it was affiliated with one ministry of the MIIT.  It's not any ministry.

THE COURT:  Let me interrupt you.  Am I remembering this correctly, that the language affiliated with, or affiliation, was implicated in his -- in what he was construing it to, but for some reason he discussed the word "affiliate" or "affiliate," instead of "affiliated with," and there are differences.

MR. RIESS:  Yes.

THE COURT:  I'm not quite sure why that happened.  Of course, I haven't seen the briefs before him or heard the argument, but that's at least -- I mean, it's a different statute, as you say, with different language.  But in addition, there was this gloss or interpretation put on the words which certainly, as I look at our statute, doesn't make any sense to me.

MR. RIESS:  I agree, Your Honor.  I think we've mentioned that we think he interpreted "affiliate," "affiliated with," he looked at definitions of "affiliate" and said I'm concerned about the breadth of this statute, so I'm going to construe it narrowly to require effective control, Chinese effective control of an entity.

I agree with Your Honor.  I don't think that that was an appropriate definition for all those reasons.  But I can see what's motivating him here.  I think he was concerned about the breadth of the statute.  But, for a couple of reasons, that's not what we have here.  As I've just mentioned, it's not any longer any ministry of the government of the PRC.

It also had much harsher consequences.  Under 1237 it banned U.S. persons from even possessing the company's publicly traded securities or any derivatives.  All people had to divest all securities from these companies.  So you were looking at any Chinese government ministry and the consequences were severe.  I think that's really important because Judge Contreras was, as I said, concerned about a very broad definition and so it shows the narrow definition requiring effective control.

But 1268 uses much different language.  We are looking here at whether the development of this dual-use technology means the entity was a fusion contributor to the Chinese defense industrial base, we're not looking at "affiliated with."  And that's doubly important.

First, because what *Luokung* said was the fact, well, the fact that these technologies had military applications wasn't enough because it wasn't enough to show effective control.  And again, we aren't using this to show effective control, we're saying that the entity was a contributor to the

Chinese defense industrial base.

That leads, though, to the second point. There is no mention in 1237, the statute at issue in those cases, of military-civil fusion. So it makes sense. Judge Contreras might have had pause about dual-use products in that. It's not mentioned. But here, that's the specific type of conduct that Congress is after, military-civil fusion contributors. China is trying to fuse its military and civilian sectors, and a key way it's doing that is sponsoring the development of advanced dual-use technology.

So for all those reasons is our answer to number two. It makes sense in this instance to go after dual-use products.

And so, finally, going back to number one. I'll just summarize our argument because it's presented in our briefs. But the answer is no, neither the definition of Chinese military company in (d)(1), nor the provision saying that an entity is a Chinese military company if, among other things, it's identified as a fusion contributor. Neither one, nor anyplace in the statute, requires DoD to make a finding that an entity contributes to the defense industrial base in more than a de minimis or incidental way.

With that said, as I've just explained, we win even if the answer is yes because here DoD did of course find that Hesai was a Chinese military-civil fusion contributor to the Chinese defense industrial base. So the issue is -- it may be

really academic.

That's it.  If the Court has any additional questions, I'm happy to address them.

THE COURT:  So this is more a question for the other side, and you may want to wait to hear what they have to say.  But one of the questions that I have thought about is should they prevail?  When a judge sends something back to an agency or department of the government, you really have two choices, you can vacate or you can say I'm not going to vacate, I'm just going to remand.  And typically you do the latter when you believe that it can be fixed without going back to square one.

Maybe the answer to that question -- as I say, you may want to wait for rebuttal, but I'm happy to hear you now.  Maybe the answer to that question depends on which of these four subparts is implicated here.  Maybe it doesn't.  I don't know.  I haven't given that a whole lot of thought.

MR. RIESS:  So I can summarize.  I don't want to deprive my opposing counsel of the opportunity to answer that.  I think the answer is, honestly, we've noted that a lot of the claims do focus on things where what would be required is additional explanation from the agency.  And so I think in a lot of these claims, even if we were not to prevail on a specific claim, I think in a lot of -- for many of plaintiffs' claims it would be appropriate to remand for additional explanation from the agency or to address it in that way,

rather than vacatur.

THE COURT:  Again -- I'm thinking aloud here -- if I found that DoD findings were not sufficient, there wasn't substantial evidence, that question would come into play.  But, if I found that it looks to me like the DoD findings were sufficient under the substantial evidence test, then -- and again, I will ask the plaintiffs this, too.  Then we're left with essentially strictly a statutory construction case, how to read the statute in these four subparts.

MR. RIESS:  I think that's correct, Your Honor.  I think the remainder of, you know, of the -- and the remainder of the briefs is basically applying the -- you know, the question of law to the facts and asking if there's substantial evidence.  The remainder is largely about statutory construction.  I agree, Your Honor.

THE COURT:  All right.  Thank you.

MR. RIESS:  Thank you, Your Honor.

THE COURT:  Okay.  Mr. -- is it pronounced Tysse?

MR. TYSSE:  Tysse, yes.  Thank you, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.

MR. TYSSE:  I certainly want to address the vacatur point, but let me start by convincing you why this is unlawful and then we can get to what the proper remedy should be.  And I'm going to take your questions in the order you posed them.

So starting where my friend on the other side left off.  And I think the questions you asked, number one and two, are incredibly important because they are -- they really get to the heart of this matter.  I do think it is ultimately a statutory construction case.  Obviously, the question is:  Is the record sufficient based on the proper construction of the statute?  But it's absolutely critical to make sure we're interpreting this statute correctly.  And I think your questions really get to the heart of it.

So the answer to your first question, which is whether or not the statute requires that an entity contributes to the defense industrial base, and does so in more than a de minimis or incidental way, is emphatically yes, Your Honor.  And I think there's lots of clues to that.  Obviously, there's the text itself.  The main thing is that the statute explicitly requires an entity to be a contributor to a Chinese defense industry base.  That is not a defined term, unlike the remainder of that sentence, "military-civil fusion contributor," that was a defined term.

But the rest of that sentence, "to the Chinese industrial base" is not defined.  And what we've said in our briefs was that if Congress had simply omitted the rest of that sentence, "to the Chinese industrial base," then defendants' interpretation of the statute would mean precisely the same thing.  And they have not offered any response to that

whatsoever.

So unless you think the statute is best read to include pure superfluity, then we think that "to the Chinese defense industrial base" must mean something.  And to your point, Your Honor, we think it means something material or significant, not de minimis or insignificant.  So that's obviously the main thing.  There's many other clues, too.

I will say, this is a list of Chinese military companies.  It is not a list of Chinese technology companies.  It's not a list of companies operating in China that make dual-use products.  It is a list of Chinese military companies.  So I think that is another clue that there needs to be an actual tie to the Chinese defense industry base or to the Chinese military.

Let's talk about the structural point, too.  As you know, Your Honor, there's two ways to be a Chinese military company under the statute.  The first one is to be essentially owned, controlled, or an agent of the PLA itself or, quote, any other organization subordinate to the central military commission of the Chinese Communist Party.  So, owned, controlled, or an agent of the military or the military wing of the Chinese Communist Party.  That's number one.

The other way to be a Chinese military company and the one that defendants rely on in this case --

THE COURT:  You should slow down a little bit, too.

MR. TYSSE:  Sure.  Will do, Your Honor.

So there's two ways to be a Chinese military company. One is, I'll call it, the ownership or control prong by the military.  The second one is the military-civil fusion contributor to the Chinese defense industrial base.  I think when you read those two together, there's a structural indication that, again, they were not looking for -- congress was not looking for any technology companies.  It was focused on relationships with the military.

THE COURT:  I want to be clear what you just said. You started by saying there are two ways to be a Chinese military.  One is to be -- one is ownership or control by the military.

MR. TYSSE:  Yep.

THE COURT:  And the other is a contributor.  And you started by suggesting those were two separate ways to do it, but then your last statement sounded to me like both had to be found.

MR. TYSSE:  No, I don't mean to imply that, Your Honor, and apologize if I was confusing.  I was simply making the point that there was a number of clues that suggest why you have to have a material finding related to contributions to the Chinese defense industrial base.  One is some of the technical points I pointed out.  This one, seems to me, to be a structural one.  Because congress had those two separate ways

of being a Chinese military company, the first one being a pretty serious finding, that you're owned or controlled or an agent of the Chinese military.  The second one, under principles of statutory construction, typically would be of a similar stature.  It would be -- implies that the second one also has some significance, you have to be really connected to the military in some way.  I'm just making that textual point.

THE COURT:  Okay.

MR. TYSSE:  I think the third one is a statutory presumption point.  I think if the defendants are right, if you don't actually have to make a material contribution to the Chinese defense industrial base, then that means a company can be a Chinese military company even if its contributions are insignificant, de minimis, or immaterial.  We don't think that accords with ordinary principles of statutory construction, as I think your question implied.

For example, I'll point you to the Supreme Court's decision in *Wisconsin Department of revenue versus Wrigley*.  It's not cited in the briefs, but it's 505 U.S. 214, it's a 1992 Supreme Court case.  Basically --

THE COURT:  What's the name of it?  I'm sorry.

MR. TYSSE:  It's *Wisconsin Department of Revenue versus Wrigley*.  It's essentially a case that describes the statutory presumption of de minimis non curat lex.  The law is not concerned with trifles.  It's just -- that case made very

clear it's the de minimis canon.  It just said, "It's part of the established background of legal principles against which all enactments are adopted and which all enactments, absent contrary indication, are deemed to accept."

So in other words, it's just a Supreme Court case saying we presume that all statutes have applied the de minimis canon.  We don't assume that when Congress says find a company that contributes to the Chinese defense industrial base, we meant to include ones that have a de minimis, insignificant, immaterial contribution.

And then, finally, there's a common sense point, Your Honor, which is that if insignificant or de minimus contributions are okay, then Congress was essentially asking the Department to list, very conservatively, tens of thousands of companies, maybe hundreds of thousands, or millions of companies.

I know that there's tens of millions of registered companies in China that might make no real contribution to the defense industrial base, other than perhaps making products that can be described as dual-use, would then be swept up in this.  And I think that would also include a number of prominent American tech companies and European tech companies that make dual-use products.  Not just paper and batteries, I'm talking about high-tech companies, companies like Amazon or Google that develop AI or autonomous vehicle technology.  Under

their definition, those companies are swept in as well.

So that is why we think, as part of their finding, they need to make a finding that an entity makes a material and significant contribution to the Chinese defense industrial base. And that's a statutory construction question. If you don't adopt that construction, it means, again, at least tens of thousands, if not hundreds of thousands, or more, of companies, congress was asking them to be listed. And to us, that just doesn't accord with what congress was trying to do in the statute. It was not asking them to list companies without any sort of limitation or distinction.

And I want to make an important point about how we sort of got here and what the finding is with respect to that. So, Department points out that, well, we did make that finding. We said that in an abundance of caution -- although those words are not in the actual decision memo itself. That's a litigation counsel rationale. But they say that out of an abundance of caution, we did find that you are a defense industrial base contributor. But if you actually look at the page that -- where they made that finding, it's on the NDAR11. So that's the new administrative record, it's in the JL.

But, what they say, essentially, is that this is the critical finding -- it's on about three sentences or four sentences in a 20-page report -- it says the PLA uses LiDAR in its development of autonomous vehicles, which can have military

applications.  Okay?  They say a couple other things as well about how LiDAR is dual-use.  But the critical finding is that these autonomous vehicles -- PLA uses LiDAR to make autonomous vehicles which can have military applications.

If that is the standard, Your Honor, then this statute applies to essentially every technology company in China, including prominent American ones.  That finding does not say that Hesai actually provides research to the Chinese government or the Chinese military or supplies products or services for defense purposes.  There's nothing about Hesai specifically, it's simply that they make a technology which -- it's not part of the record because they didn't allow us to -- the process that would have allowed the development of the record, but Hesai makes a product that is essentially a commodity product that they sell for -- it uses high technology, but the purpose of it is to get it onto consumer automobiles.

So there's a lot of price pressure to bring that technology cost down.  It's the opposite of a military procurement process where the military needs technology that can see for -- for example, there are LiDARs that can see up to 2 kilometers.  The product my clients makes can see about 200 meters.  There are LiDARs on i-Phones that allow the camera to function properly.

This is a technology that is -- they toss around

words like this is going to be, you know, used to infiltrate the U.S. military.  But, first of all, those findings are not actually in the report.  These are all, again, post hoc kind of explanations of counsel sitting here today.  But, also, it's just not tethered to the reality of this product, which are sold cheaply to car manufacturers in Europe and the United States and around the world.

So I want to make another point about the *Xiaomi* and *Luokung* cases.

THE COURT:  About which?

MR. TYSSE:  The *Xiaomi* and *Luokung* cases, the Judge Contreras opinions.  I absolutely take the point, Your Honor, it's a different statute.  No question about that.  It uses different language.  But I would also like to point out that it's not a totally dissimilar statute.  Everyone agrees that it's the predecessor statute to § 1260H.  It's the original statute.  They made a few different listings on it, they were immediately enjoined.  Basically congress started over and tried again with a different statute.

So the language is different, but not totally different.  And what I'd point you to in particular -- this is one of the appendices to our motion for summary judgment.  I have the language of § 1237.  And what it says is that a communist Chinese military company -- so in our statute it's a Chinese military company, in that case it was a communist

Chinese military company -- includes any person that is owned or controlled by an entity affiliated with the defense industrial base of the People's Republic of China.  Controlled by an entity affiliated with the defense industrial base of the People's Republic of China.

Obviously, "defense industrial base" is a term that's in our statute.  And essentially what they're saying is Hesai is affiliated with the Chinese defense industrial base.  So I think a lot of the concerns -- again, it's not identical, I'm not saying it should be applied as precedent or anything like that, I'm just saying a lot of the concerns that Judge Contreras recognized I think apply very much to this case as well, particularly if you don't interpret "contribute to the defense industrial base" in a way that has some significance.

Without meaningful -- without applying meaning to that provision, this whole statute does not make sense.  It means that congress was asking DoD to add Amazon and Google and tens of thousands of other companies to this list.

And let me just quote very quickly from the *Xiaomi* case because, again, I think there's --

THE COURT:  Focus on what?

MR. TYSSE:  The *Xiaomi* case, the Judge Contreras -- the first Judge Contreras opinion.

THE COURT:  I don't remember the names of them, I just think of them as Judge Contreras's two opinions.

MR. TYSSE:  I'll just say Judge Contreras's first opinion.  But in that case the government's specific argument in that case, they said very explicitly that *Xiaomi* made 5G and AI technologies and that those have military applications, as well as civilian ones.  That was their main argument for saying that it was affiliated with the Chinese defense industrial base.

And what Judge Contreras said is the fact that those technologies have military applications as well cannot be enough to support the conclusion that Xiaomi is a communist Chinese military company.  Such an outcome could result in a situation where any Chinese company involved in technology that has alternative military uses could be designated as a CCMC, even U.S. technology companies.  And the Court said it was troubled by the lack of any limiting principle.  I submit, Your Honor, that it's the exact same lack of limiting principle here.

So *Xiaomi*, that is the first Judge Contreras case. The second Judge Contreras case was called *Luokung*.  That one did not involve mere AI and 5G technologies, it involved -- let me see here -- commercial space products, including spacial, temporal, big data applications, aerospace application systems, measurement and control systems for rockets, satellites and earth stations, and, finally, AI -- and I think this is crucial -- autonomous systems.

THE COURT:  AI and what?

MR. TYSSE:  Autonomous systems.  In other words, the very same technology that the Department of Defense says is a crucial dual-use military technology.  So it's not only that I think there are some echoes between the two statutes that are relevant, it's also that the technology in those cases was serious, too, and Judge Contreras had the very same concerns in those cases.

So that's, I think, my answer to the first question, Your Honor.  I'll try to move through the other ones more quickly, since I know we have limited time.

THE COURT:  That's all right.  I'm not holding either side to the time that you propose.

MR. TYSSE:  I appreciate it very much.

THE COURT:  And we'll take a break before rebuttal so everybody can think about what they really want to say in rebuttal.

MR. TYSSE:  That's terrific, Your Honor.  Thank you. This is obviously very important to our clients.  We appreciate the indulgence.

As I said before, I think the dual-use question is exactly the right one for all the reasons I just mentioned, otherwise there's really no limiting principle.  And I think it's -- I really want to emphasize that we're not saying that DoD has to list everyone or no one or list everyone all at

once.  That's not the question.  The question is what does the statute mean?  And so, if the statute means what they say it means, that means there's no limit to who they can list in their discretion.  They just have pure discretion.

Any company that makes a dual-use product, which in our view is every company -- and that's also, incidentally, the Department of Commerce's view -- can be eligible for listing.  And that is a plausible view, I suppose, that congress might have wanted them to list every Chinese company, but we think the far better reading of the statute is the one we have offered, which actually has some guardrails around what congress was trying to do.

And it should not be, in our view, an insurmountable task to show that someone contributes to the Chinese military or the Chinese defense industrial base.  We agree it doesn't necessarily mean -- I think in many cases it will mean you supply products to it, but it doesn't necessarily.  But I do think you actually have to show a contribution of services, of support, of products, of something to the Chinese defense industrial base and dual-use -- producing dual-use products alone can't be it.  And I think that's our key.

I just want to remind the Court, too, how we got here.  The original designation, the Department did not make any finding regarding the contribution to the defense industrial base at all.  It just wasn't in the listing.  We

pointed that out in summary judgment and then the case was fully briefed for summary judgment and about a week or two before argument, the Department asked to redo its designation. So then we get the new designation and we see for the first time they made a finding, which they now call, again, out of an abundance of caution. But in that case it was solely that the products are dual-use. No other connection to Hesai. And the only evidence for that was an obscure article, I think we pointed it out in our briefs.

THE COURT: But why is the original finding relevant at all as we go forward?

MR. TYSSE: It's not, Your Honor. I'm just trying to recap, essentially, the inadequacy of the dual-use finding all along. Right? They didn't even make a dual-use finding. They only did it once we pointed out they completely failed to do so. And then even when they did, we think it was still wholly inadequate. It was based on some random internet article from a New Jersey lens company. And then, finally, when they tried to support it, they focused on the dual-use nature and that's all.

I want to point out briefly that -- to make the point that we had made in our sworn declaration from the company's CEO to the Department, which was never referenced in the report, which is there is an expert agency in the United States government that tried to decide what dual-use products are

actually sensitive, and it's the Department of Commerce and --

THE COURT:  You're talking about the declaration from your CEO?

MR. TYSSE:  From our CEO.  That was part of our record, which we have a separate APA claim saying they failed to respond to it, but I'm not focusing on that now.  I'm focusing on what, again, I think is the crosscutting issue here that resolves all the other issues in the case, if you agree with us, which is the contribution to the defense industrial base point.

But, the Commerce Department is actually the expert agency that tries to figure out what dual-use products are and are not significantly -- or, significant for export and what are sensitive or not.  And I think it's very significant that the Commerce Department itself says on its web page -- we've cited it in our briefs and I think it can be judicially noticed -- all products essentially are dual use.  It says most commercial products.  It doesn't say all, it says most commercial products are dual use.

Some minority of products are actually sensitive and should be regulated for export.  It does actually include a few LiDARs, specifically, space LiDAR, I think, is one of them, and there's another -- again, not something our company makes or anything close to it, but essentially LiDAR that can operate several kilometers at a time from outer space.  So not the kind

of thing that you would put on a BMW or a Ford.

The government doesn't address that at all. It just says, well, you make a dual-use product, accordingly, that's sufficient. We just don't think that's the proper interpretation given. I think, at a bare minimum, they should have had to engage with the fact that the expert agency of the United States government that tries to figure out what dual use technologies are most sensitive does not consider the type of LiDAR we have to be sensitive.

So, I want to make the point, as well, about the dual-use nature of the products. What the government says, I think, as I mentioned, is that the main technology alleged to be dual-use is not only LiDAR, but autonomous vehicles. If you look at NDAR11, that's the quote I made -- said before, the PLA uses LiDAR in its development of autonomous vehicles, which can have military applications. And opposition brief, page 23, the government's summary judgment brief makes the same point about how any progress towards autonomous capabilities inherently has military applications.

Well, the problem that we see with that, Your Honor, is that we pointed out, and the government does not dispute, that many international companies, European and American, also make autonomous technology. They develop it, it's on their websites, Volvo, Continental, Autoliv, all mentioned in our briefs, all have Chinese subsidiaries and they all develop

autonomous driving technologies as well.  And the same is true with GM with its cruise technology, with Amazon with its Zoox technology, with Google with Waymo, and with Tesla.  All of them have -- and those are just naming random examples, all of them have Chinese subsidiaries, all work on autonomous vehicle technology.

I think Volvo, in fact, is the perfect example because it resides, as the government accuses Hesai of, residing in the Jiading industrial zone and developing autonomous vehicle technology.  Well, Volvo does the same thing, it also resides in the Jiading industrial zone and develops autonomous vehicle technology.  And we pointed that out in the brief and the government has no response.  And I think that falls right into a line of cases, I think exemplified by the *ACA International* case.  It's an en banc decision from the D.C. Circuit in 2018.  And it had to do with interpretation of the TCPA, Your Honor.

But I think the crucial point for present purposes is it said -- I won't get into the specifics unless you'd like me to, but I think the crucial point is that it said that an agency's interpretation is unlawful when the agency cannot satisfactorily explain why a challenged standard embraces one potential application but leaves out another seemingly similar one.

I think that's exactly the fatal flaw in the

government's application.  It just says you are affiliated with the MIIT or you reside in an industrial zone.  And we pointed out, well, there's all the other companies, like Apple is also -- it's the same license they accuse of getting.  Or Volvo resides in the same zone you accuse us of residing it.  And the government says, well, you make dual-use technologies.

As I just pointed out, Your Honor, all -- every major technology company, every major automotive technology, makes advanced technologies, both mundane and advanced technologies that could be described as dual-use.  So if dual-use is enough, there is no standard and the statute, I think, becomes incoherent.

I'll briefly talk about the last two points, Your Honor.  Question three had to do with -- and, obviously, if you have any questions, please, please fell free to ask.  But I think the question on three, we agree, Your Honor, that the statute would allow DoD to say one factor alone is enough.  It does say any one of those factors.  I do agree with that.  But it's not entirely clear that's what DoD actually did in its decision.  And, in fact, what I think I heard from my friend on the other side say today was that the decision was not based on any single factor standing alone, but it was actually based on a constellation of factors.

THE COURT:  Well, I think -- let me put it this way:  He did say that.  My question to both of you is:  Would it be

sufficient if it was any one factor?  So while he said the decision was made on a constellation of factors, as I read the new decision -- and maybe it was true in the original decision as well -- they do discuss the evidence supporting each of the four factors separately.  So it may be that the constellation-of-factors argument helps them, bolsters them, but as -- if what I'm -- I'm separating out substantial evidence on the fact-finding versus the statutory construction.

On the substantial evidence of the fact-finding, if the operative document is the new decision, then if I find that there's substantial evidence to support any one of the four factors, then there's substantial evidence and then I can look at the statute.

MR. TYSSE:  Right.  So let me try to answer this way:  So we think if you agree with us on the contribution to the Chinese defense industrial base, then it's just a question:  Is dual-use enough?  Because, I don't think, again, they even allege that we have any other contribution.  So if you resolve that, you don't even have to look at the four factors because, we think, and I think the statute is very clear, it's an independent requirement.

But putting aside -- but say we want to look at the four factors and whether they have substantial evidence, the way I read the statute is they could have written a decision that said we found Factor One applies and, in fact, that factor

alone is sufficient.  And that is, indeed, what happened in the *PDK Labs* case they cite from the D.C. Circuit, from 2006.  The agency in that case says this factor alone is sufficient.  So, on appeal in the D.C. Circuit the Court said, well, it's very clear they said that factor alone is sufficient, we find there's substantial evidence for it, case closed.  Affirmed.

Okay.  But that's not exactly what happened here, at least that's not what the government is telling you.  I think you're right, Your Honor, it went through each factor one by one.  But in both the introduction and in the summary -- so I'm looking at NDAR10 and NDAR17, what they said was:  The side group is a military-civil fusion contributor to the Chinese defense industrial base because one, two, three, and four.  Right?  And they did it twice.

So, again, not a ton of evidence.  Maybe they meant to say each one individually is sufficient, but it's not totally clear.  But I think, Your Honor, if you take my friend, what he's saying as representations as true, that this was -- they're not going to focus on companies that just have one factor, or whatever.  They want companies that have a number of them.  Then, I think, to borrow my friend's rope analogy, if you have a rope with four strands and it turns out there's not substantial evidence for one or two or three of those strands, then you no longer know whether they still would have listed the company, absent that evidence.  You know, it's like a table

with four legs.  If you knock out one or two of the legs, it doesn't stand anymore.

So I think that just becomes a harmlessness question. And, I think, in this case, several of the factors, I don't think they come close to meeting a substantial evidence standard.  I think that's true for factors three and four particularly, it's not even a question.  Four, they don't even say that we advertise.  They say we didn't know the facts at the time we listed you.  But that's not sufficient to overcome substantial evidence standard.  And same thing with the military civil-fusion residence.

I mean, their own evidence says there's a park in a particular district that is associated with military civil-fusion and they don't offer, argue, or claim that our company is even resident in that military-civil fusion park. They just call the entire district of something like 80-square kilometers a military-civil fusion zone.  And, of course, as we pointed out, Volvo and Amazon and other companies are also in that same District.

So, those are some examples.  We think there's problems with all four of the factors.  But I think there's actually a case that -- they cited the *PDK Laboratories* case from 2006.  I noticed in preparing for this that in 2004 there was an earlier iteration of that *PDK Labs* case.  And that's at 362 F.3d 786.  That's the D.C. Circuit in 2004.  And what it

said was you relied on five things, four of them we're not sure were legally valid.  So instead of just affirming and saying there was substantial evidence for the fifth, we're going to remand because it's not harmless.  And, in fact, they vacated and sent it back for further review.

Then in 2006 it came back up and that's the case the government cites.  And in that case the Court said, well, you said that that factor alone was sufficient, so we don't need to look at the other four that were controversial.

So we think the same thing could happen here, Your Honor.  We think, notwithstanding the fact they could have said a single factor was sufficient, if they really did rely on a constellation of factors, then that's a separate way to get to a vacatur here, which is to say you -- it's -- it was not harmless.  If you got some of your factors absolutely wrong, there's no substantial evidence for them, you know, we can't affirm on that basis, we have to send it back and vacate in the process.

All right.  Finally, let's turn to due process.  Your Honor, I was surprised, to be honest, to hear the government's description of *PMOI* because, to me, it did not sound like the case that I had read.  PMOI involved an alleged foreign terrorist organization.  And what the Court said very clearly, with no hesitation, that it was required to be notified of unclassified material on which the secretary proposes to rely

and an opportunity to respond to that material before its redesignation.  There was no question about that.  And that was based on a series of other cases, most notably, *NCRI One*, is what PMOI calls it, so I'll call it the same thing.

But it was very clear on that point.  And that was true, notwithstanding this was an alleged foreign terrorist organization that was operating in Iraq during the Iraq war and was alleged to sponsor suicide bombings and a number of other heinous activities.  The Court, nevertheless, said the secretary of state is required to give this organization process.  And that was true even though the agency informally met, at the entity's request, even though the agency allowed the entity to supplement the record with evidence after the designation.  And even so, the agency pled harmlessness in that case.

And what the Court said, and it was quoting NCRI One -- so that's also a relevant case and I think absolutely supports us here -- judicial review is not sufficient to supply the otherwise absent due process protection.  The review scheme was limited to the adequacy of the record before the Court. The record is currently compiled by the secretary without notice or opportunity for any meaningful hearing.

So we have no reason to presume that the petitioners in this case could have offered evidence which might have either changed the secretary's mind or affected the record.

But without the due process protections, which we've outlined, we cannot presume the contrary either. So in other words, it was very clear that the process was due and that it was not sufficient to have a post-deprivation process.

Now, what my friend on the other side says is the deprivations were more serious in that case. And I will grant you, some of them were quite serious, including seizures of a bank account. Although, I will point out that in *NCRI One* there was only an alleged interest in the bank account. It was not clear that it was very significant at all. But even assuming the deprivations were more serious, that only -- that does not affect whether due process attaches, which is the only question in front of Your Honor today.

In a situation here where -- and I'm again quoting from the *NCRI One* case -- "The question is whether the appropriate rule of law is that where the government issues a stigmatizing designation" -- no dispute here, this is what it was and, in fact, it sounds like that was part of the purpose of it -- "as a result of which the stigmatized individual is deprived of a right previously held under state law, due process is required." And in particular, it went on to say, pre-deprivation due process is required.

And I think it's important, in that case the Court focused on two Supreme Court cases, one of which involved a publication by a sheriff of a list of known drunkards. And it

said if it was simply a stigmatizing list that said you're a known drunkard, no due process would be required.  But because it also banned the sale of alcohol to that person for one year, then due process attaches.

So the rule from that case -- and this is the *NCRI One*, walks through this, it says:  If there's a stigmatizing deprivation -- or, designation, as here, and where you're deprived of a right you had, then that is enough for due process to attach.

So I think as applied here, it's quite clear there was a stigmatizing designation.  And there's no dispute that a number of rights that Hesai otherwise would have, such as the right -- in fact, currently has the right to bid on department contracts next year, the right to bid on Department of Homeland Security contracts today, and the right to participate in CHIPS Act funding today all deprive us of liberty interests at this time.

So I think *PMOI* absolutely --

THE COURT:  The right to bid on contracts or apply or whatever, does the case law require -- I mean, are you -- have you been deprived of something -- I guess my question goes something like this:  Have you been deprived of something before you've actually applied and been rejected?

MR. TYSSE:  I think that's a great question, Your Honor.  I think the answer is no.  I think this goes to the

point my friend on the other side makes about ripeness.  It is true that if we were challenging the lack of our ability to contract with the government, the question of ripeness would arrive.  The question, you know, could -- if we're not actually planning to, for example, bid on the Department of Defense contracts, it wouldn't matter whether it was ripe.  I just don't think that's the right question here.

The question is:  Does due process attach?  And according to the rule I just read, where the government issues a stigmatizing designation as a result of which the stigmatized individual is deprived of a right previously held under state law, due process is required.

So the way I read this is it's a perfectly ripe dispute right now.  We are saying you deprived us of due process.  That's the ripeness question.  It's not whether we plan to bid on government contracts.  We have been, today, deprived of a right we used to have and we've been stigmatized because of that deprivation.  So I don't think there's any question that that applies.

One more quick point on this.  I think he suggested that the decision might be limited to the context of the foreign terrorists organization.  I don't think that's true.  He cited a couple district court cases involving OFAC.  He did not mention that the *Ralls* case specifically held that the -- that was a 2014 D.C. Circuit opinion, specifically extended

that precedent to the CFIUS context, which I'm sure you're familiar with. But, essentially, the government oversight of foreign purchases of property. And the Court very clearly said the fact that *Ralls* had the opportunity to present evidence to CFIUS and to interact with it is plainly not enough to satisfy due process because, as here, Ralls never had the opportunity to tailor its submission to the appellee's concerns or rebut the factual premises underlying the action.

And it said specifically, "Nor does the uniqueness of the foreign terrorist organization context distinguish those decisions. And those decisions are *PMOI* and *NCRI*. It says: As we noted in *NCRI*, AEDPA itself had -- there was a dearth of procedural participation and protection afforded the designated entity. Given the similar lack of procedural protection afforded by the Congress in the DPA, which was the statute issued in *Ralls*, we find the foreign terrorist organization precedent precisely on point.

So it's been extended beyond the foreign terrorist organization context. As far as we know, it's not been limited by the D.C. Circuit in any sort of designation context like this where there's been stigma plus the deprivation of a right.

The final point on this, Your Honor, is that I think the Court in *PMOI* made the point that the lack of process also should affect your review of substantial evidence as well, to the extent, again, you get to that point. And the reason is

that what the Court held was to the extent we defer to the secretary's factfinding process, it says, "We do so with the understanding that the secretary has adhered to the procedural safeguards of the due process clause and afforded the designated organization a fair opportunity to respond."

So I do think if you take that clause at its word, then the amount of deference you give -- and when you're reading the record, you should bear in mind it's a one-sided record, prepared by the government, that has interfered with the proper review by this Court because we have not been able to rebut many of the factual allegations in an orderly way. And I think that's borne out by a lot of the mistakes you see in the designation itself, including things that could easily have been cleared up had they provided notice and opportunity to be heard during this process.

I want to talk about vacatur, but I am cognizant of how long I've stood. If you give me 30 seconds, I'll do a quick shot, which is that this is a vacatur case, Your Honor. The -- there's been a number of deprivations, the main one being there's just no factual support for the Chinese defense industrial base contribution finding. It's simply you make dual-use products and you have a number of connections to the Chinese government, ergo, you are a Chinese military company. That can't be enough.

This is also their second opportunity. They had an

opportunity in the fall.  They voluntarily gave up their old decision and replaced it with a new one.  Their do-over designation we don't think fixes any of the problems.  And if you agree, then it should not be remanded without vacatur for them to have another shot at making it.

If you vacate and send it back, they will have an opportunity, if they want, to try to re-list the company, this time with due process protections.  But until then, we think this is a case where they've had their opportunity, they've had more than enough opportunity and vacatur is the appropriate remedy.  Thank you.

THE COURT:  Thank you.

All right.  Why don't we take a 15-minute break and we'll hear again from the government and again from the plaintiff.

(Recess.)

THE COURT:  All right.  Mr. Riess.

MR. RIESS:  Thank you, Your Honor.  I'll do my best to be brief on rebuttal.  I think I'll confine the rebuttal to points made with respect to questions --

THE COURT:  Get a little closer to the microphone or something.  I know you're tall.

MR. RIESS:  I know, it's a problem with my height.

I'm going to reserve to points raised with respect to questions two, three, and four.

On question two, which was about dual-use.  So I think the point made on that -- let's see, with respect to the Judge Contreras cases.  It's true that they're not totally dissimilar, but, again, there was absolutely no mention in § 1237, the now defunct statute that was issued there, about military-civil fusion, and here we really do.  So I think that's a powerful distinction between that and the statute here, 1260H.  I just wanted to reiterate that.

On the point about no limiting principle if there's dual-use, I don't want to reargue the points I made in the beginning, just to say, though, that, I mean, the D.C. Circuit in the *TikTok* case said -- and this is a paraphrasing -- China prepositions commercial entities in the U.S. that it can later coopt as part of its long-term strategy to undermine U.S. national security.

I mean, that's similar to what it's done here.  We're not saying any dual-use, it's these specific concerns.  Hesai, as we have pointed out with record evidence -- and this is administrative record 17 to -- 15 to 16 -- Hesai is a significant contributor to the Chinese national defense by developing advance technology that has a specific application, development of autonomous vehicles.  That raises specific national security concerns about Chinese dominance of the market, and that concern about Chinese dominance in the market is about the concern about its products leading into U.S.

government supply chains and military supply chains, as I was talking about. It's not that it, you know, could apply to any dual U.S. products. If anything, it applies here.

I think the point, too, is that -- let's see. In addition to the points about limiting principle, plaintiff's point to companies like Amazon, like Volvo -- and I think we'll just note that it has not pointed to -- it hasn't shown that they are similarly situated to all of these other international companies. Even if perhaps one piece of evidence happens to do it, we're not looking at just that. For each of the prongs under (d)(2) we're looking at the totality of the circumstances, meaning all material evidence that relates to that prong. So I don't think that that really works here.

Plaintiffs' counsel made a point, too, about, I think, the Commerce Department.

THE COURT: About what?

MR. RIESS: About the Commerce Department.

THE COURT: Yes, yes.

MR. RIESS: About dual-use. I'll just point out, respectfully, Commerce is not the only expert agency on dual-use products. The defense department is certainly an expert on dual-use military products.

And, two -- there's two points. Congress could have chosen to exclude the EAR99, the Commerce Department products that are exempted from consideration in this context, in this

statute, but it didn't. And in any event, the Commerce Department also says things, that if you export these items, you still need to do careful due diligence to make sure the item isn't going to a prohibited end user. That's in our briefs. So even Commerce recognizes that these dual-use products can be dangerous, and that's what we're concerned with.

Question three. So I just want to be clear, because I think -- I think we are actually all in agreement on one point. I think we are in agreement that under (d)(2), if -- as a legal matter, "any" means "any." That is, if the DoD finds that there's substantial evidence under one prong, that's significant. As Your Honor pointed out, that's the legal matter. As a practical matter, it's -- DoD chooses to allocate its resources. It chooses to focus on entities that satisfy more than one prong and it -- here it satisfied multiple prongs with substantial evidence under each one. It could have chosen to -- I mean, to list one.

And I think plaintiffs' counsel talked about a potential remand if the Court were to find that one or more prongs weren't met because perhaps the Department might not have found that. Again, for that reason, I don't think it's appropriate here. There's a difference between --

THE COURT: You're talking about remand? Now are we talking about remand if there's a lack of substantial evidence

in the record, not remand about how you read the statute?

MR. RIESS:  Correct, Your Honor.  I was just making a point.  Plaintiffs' counsel, I believe, said maybe the Department wouldn't have listed Hesai if it had just found under one prong.  And so if you find that the evidence under a particular prong isn't sufficient, maybe you should remand for that.  That's confusing what we were saying about what's legally sufficient.  You just need to find one (d)(2) prong.  And what DoD's practice is, its practice is to find -- go after entities that satisfy more than one.

It's not -- would they have listed isn't the point, it's -- what they're saying is it's legally sufficient to just find under one prong.  Here we have four.  That's the only point I wanted to make on that.

And just the final question --

THE COURT:  Before you get to *Mathews*, I want to talk about substantial evidence for a minute.  You rely heavily on this Defense One article, NDAR1714-1716, is there other evidence in the record that suggests that Hesai contributes to the Chinese defense military base in more than an incidental or de minimis way?

MR. RIESS:  So I believe our finding is primarily concerned with that article.  That said, I can attest to the fact that this is not just an article that was located on the internet that was randomly chosen.  DoD here uses data

analysts, and their bread and butter is to look at companies that might have national security concerns.  They know what's material, they know who's reputable as a source to look for for this information.  And they're subject matter experts in the area.

So we also note the Defense One is a part of *Govexec*, which is a news publication that started back in 1969.  It's just -- it's not a fly-by-night company.

The bottom line, though, is DoD analysts, they have the know-how to know who is reputable and who is credible.  And they conclude that the Defense One publication is -- you know, we can rest assured that it does represent a reputable source of information.

So on question four, the due process point, I think, first, on the *PMOI* case, I guess I just want to make it clear, that does not stand for the proposition, that case, that all designations require pre-deprivation process.  If there's a special reason for prompt action, the -- and here we've shown all of the three factors from the *Holy Land* District Court case apply.  I think that really distinguishes this from the sanctions case.

THE COURT:  Did the Court in *PMOI* discuss the *Holy Land* case?

MR. RIESS:  So I don't think -- I don't want to leave the impression that these factors are coming from the *Holy Land*

case.  I think -- I'm pretty sure they predate it.  That case, I believe, was 2002.  They predated.  This was just a DDC case that was mentioned in our briefs, and so it predates that.

THE COURT:  I get that, but, you know, in *PMOI*, they did say that PMOI was notified only after the decision was final.  Had no opportunity to rebut the unclassified portion of the record in advance.  And at the end, "Nor do we find the secretary's failure to provide the required notice with respect to unclassified material in advance of her decision harmless, because the information at the heart of the secretary's decision is classified and could not have been shared.

I take it from that, that what the Court is saying in *PMOI* is, look, they had to provide notice and an opportunity to be heard on the unclassified material in advance, and they didn't and that's a due process problem.  Now, had they done that and PMOI had come back and said, well, that's not enough, either when you -- when you provide the unclassified stuff, you'd also say here's the unclassified stuff, but you should know we're relying a lot on classified stuff, too.

Or when PMOI comes back and says, look, this is not enough.  You say maybe it isn't, but in combination with the classified stuff it is.  And that, at least in the trial court, there are a number of a options that PMOI/MOI would have had.  They could have said:  Can we get clearances so we can look at this stuff and then have discovery?  And I don't know what the

trial judge would have done, but it seems to me that the Court of Appeals was troubled -- not only troubled, but actually held that under *Mathews* there should have been pre-decision disclosure and opportunity to be heard with respect to the non -- unclassified stuff.

MR. RIESS: Right. I take your point on that, Your Honor. And just to be clear, there isn't any classified information in this particular case, so I don't think we have to concern ourselves with that. My point is only -- and I take plaintiffs' counsel's point that the *PMOI* case might have been applied outside of the foreign terrorist organizations context. The point, though, is really that it doesn't stand for the proposition that if the government -- as long as the government designates an entity and there's consequences from that, it has to provide pre-deprivation process. If that was the case, then OFAC wouldn't work.

But the D.C. Circuit and DDC cases have repeatedly held you don't need to do post-deprivation process because of the special concern about taking prompt action. And as we've explained, on the basis of the three *Holy Land* factors, there's a similar concern here.

We cite the *Lopez Bello* District Court decision as the justification for that. And I just wanted to point out, that is not just the -- a single case. On page 40 of that decision, all of those points we were citing, it cites D.C.

Circuit case authority for that.  So it's not just one DDC decision.

I also wanted to just note, under the -- we had made a number of points under the *Mathews*.  The first factor, the private interest, plaintiffs' counsel pointed out that due process should, nevertheless, still apply.  Our point is just that even if due process protections do apply here, all of those points that we made about the relative less -- less extreme sanctions and the distinctions with those cases.

For all those reasons, the private interest is lessened, even if due process protections attach here.  It should be accorded less weight in the balancing process.  I just wanted to make clear that was the point I was trying to make.

I'm happy to address any further questions, Your Honor.  But if not, we respectfully ask that you enter judgment for the defendants.

THE COURT:  Okay.  Thank you very much.

MR. RIESS:  Thank you.

THE COURT:  Mr. Tysse.

MR. TYSSE:  Thank you, Your Honor.  I will also endeavor to be brief, and would love to answer any questions you have, as well, to make sure that you have no concerns about any of the things I've said.

Let me start with the dual-use point, because I do

think it is a, sort of, crosscutting issue that really cuts away a lot of the other issues in the case.  I think if you agree with us on this dual-use point, that's sufficient, you don't then need to get into substantial evidence.  You don't need to worry about even the due process point, other than we would urge you in vacating, to tell the government to provide us process going forward.  But I think the dual-use point is very significant for all the reasons I've already said.

But I think the key on the dual-use point is the limiting principle, and what my friend on the other side --

THE COURT:  Let me ask you about limiting principle.

MR. TYSSE:  Please.

THE COURT:  Those words come from Judge Contreras.

MR. TYSSE:  Right.

THE COURT:  Judge Contreras uses those words in one of his two decisions and then, arguably, discusses the same concept without quite using those words.  Where do those words come from, other than from Judge Contreras?

MR. TYSSE:  Your Honor, I think he's trying to parse the statute and he's trying to figure out what congress would have intended.

THE COURT:  What does that mean?  I looked at Judge Contreras's opinions very closely.  He cites one -- his one case that he cites in support of his statements about limiting principle, and that's a Supreme Court decision in *Yates*.  You

look at *Yates*, *Yates* never uses the term "limiting principle." Yates engages in traditional statutory construction, looking at the words of the statute, the plain meaning of the statute, and the context and the relationship between different parts of the statute.

So I'm not sure that -- I mean, I'm happy to hear an argument, if it matters, but I'm not sure that I'm going to pay any attention to Judge Contreras -- I'll pay attention to him, certainly in the judge's lunchroom, it's really fun to spend time with him.

MR. TYSSE:  Fair enough, Your Honor.

THE COURT:  But the case law talks about really the heart of both sides' argument, which is what do the words of the statute mean?  Correct me if you disagree.  What do the words of the statute mean?  How do these different pieces of it fit together?  And, obviously, looking at the plain words, but also how they are defined, how one part fits with the other, and the context of the whole thing and the purposes behind what congress was doing.  That's my feeling the more I read and prepared for this argument.  But I'm not telling you don't argue limiting principle.

MR. TYSSE:  Well, Your Honor, I think that's all fair.  And to be clear, we're not trying to suggest that limiting principles is a term in the statute or should be accorded precedential weight.  I think the point we're trying

to get at is the very one you mentioned.  We're just trying to parse what this statute means based on the language Congress used, based on the structure of the statute, based on its evident purposes and based on common sense.  And I think the limiting principle really falls into that last category of common sense.

And the reason why it comes up is because, if you accept our interpretation, there's a limited universe of companies that Congress was trying to have designated, essentially, military-civil fusion contributors to the Chinese defense industrial base, and not, for example, all Chinese technology companies, or even all European and American companies with Chinese subsidiaries.  It was a more limited universe.  And I think that's what Judge Contreras was getting at and we're making the same point.

It's a common sense point ultimately, or even an absurdity point, because I do think that there would be hundreds of thousands, a million companies that could be on the list if it means what they say it means, if they don't have a way to distinguish the examples we've given from the examples they've chosen.

And I'll point you to a specific case that I think helps illuminate this, obviously in a very different context.  But it's the *ACA International* case I mentioned earlier.  And it's the en banc decision of the D.C. Circuit.  And what the

Court said was the definition that the agency has given to the statute has, quote, an eye-popping sweep.

THE COURT:  It's what?

MR. TYSSE:  An eye-popping sweep.  It is eye-popping in its breadth.  And I would submit it's the same here. They're saying basically if you are affiliated with, i.e. if you have any close relationship with the chief industrial regulator of the Chinese economy, or if you happen to reside in an 80-kilometer area in downtown Shanghai, which is where the Jiading industrial park zone is located, or if you, you know -- of if you receive funding from the government, which the Department in its own view determines whether or not it might be military, industrial, planning apparatus associated.  They don't say you have to have any material contribution to the defense industrial base.

My friend on the other side stood up and said we have a limiting principle, but then offered none.  I think what he said was *TikTok* is a case that says, well, the Chinese government does certain nefarious activities and that was the limiting principle.  But, respectfully, I don't see that as a limiting principle in this case.

Number one, *TikTok* was obviously talking about the constitutionality of a act of congress.  It's a different scenario.  But more importantly, that doesn't -- all that the DoD is saying here is that we can list any company, as long as

we, just looking at all the constellation of factors and the totality of the circumstances, decide that they might have some affiliation with the MIIT or, again, residence in a particular zone. And it doesn't matter, in their view, that American or European companies might have the exact same affiliation.

And on this point, I just want to make this clear, because my friend on the other side said that, well, Volvo and Amazon are differently situated. Here's what their brief says about Volvo and Amazon, because we pointed out that, well, Volvo and Amazon are also located in the same addict. And they say if you're located in that district, you are a military-civil fusion contributor.

And we said, well, Amazon and Volvo are in the same area. And they said it is reasonable for DoD not to determine that other entities, such as Amazon and Volvo, have a, quote, presence, unquote, in these zones because the national security risk associated with a company that is not developing, producing, or supplying military or dual-use products does not rise to the level of a company such as Hesai that produces dual-use products.

We think that's wrong both factually -- because as, again, I've noticed, it's very common knowledge that both Amazon and Volvo and countless other companies work on the very same dual-use products we are accused of making, which is essentially autonomous systems. But it's also -- it makes the

statute incoherent because in their view, they're making a distinction that doesn't actually jibe with the statute. And that's exactly the problem that the *ACA International* case held when it said, "An interpretation is arbitrary and capricious when the agency cannot satisfactorily explain why a challenged standard embraces one potential application, but leaves out another seemingly similar one." And I say arbitrary and capricious, but in reality it said you're misinterpreting the statute, which is the same thing we're saying here.

On the *Defense One* article, I think you asked what evidence in the record is there that we actually contribute to the defense industrial base. They pointed to one document, it's the Defense One article. This is the article that was provided to us several weeks after we filed our summary judgment motion. It was filed as part of a supplemental administrative record. It is mentioned nowhere in the actual decision that you're reviewing today. It's not found there.

THE COURT: Don't they say that it was -- they say it was inadvertently omitted from the administrative record.

MR. TYSSE: That's correct.

THE COURT: But you're saying it's not even in the decision of September 2024?

MR. TYSSE: Correct. It was not only not added to the administrative record, it was not even mentioned in the decision on review. And we cite a few cases. There's a

district court case, the *USDA* case from 2022, which says in such a situation where it's not even mentioned, then it need not be considered by the Court. You know, you could vacate and send it back and if they want to try to redo the decision and focus on that decision and use that as justification, they're welcome to try, but it's just not part of the decision currently on review.

But even accepting that it's potentially reviewable, belatedly admitted, I urge you, Your Honor, to look at it. This is, again, the only evidence they have that we contribute -- I think, again, you asked explicitly what evidence do you have? This is the only thing they pointed to, this belated document. And it says absolutely zero about our company, about Hesai. It says -- that's relevant to the case. It has some sort of slanderous allegations about the company, its, like, corporate structure, but it doesn't say anything about contributions to the defense industrial base, other than the dual-use point.

Again, so I think it's a pure -- it's a statutory question, statutory constriction question for you. Is it dual-use -- is producing a, quote/unquote, dual-use product alone sufficient to be a material contribution to the defense industrial base? And if the answer is no, I don't think there's anything else in the record that would support that conclusion.

Two other quick points.  I think on the due process point, it said multiple -- my friend on the other side said, multiple times, you don't need due process, you don't need to offer due process if there's some need for speed, if there's some need for prompt action.  You know, if an entity is going to hide its identity or if it's going to abscond with -- I think it mentioned OFAC absconding with funds outside of the country.  That's not what's happening here, Your Honor.  Certainly no factual finding to that respect.  Hesai is a NASDAQ-traded company.  It can't just disappear if an accusation is made.

There's also no extreme need for speed.  They make these designations on an annual basis, so I think it's not too much to ask in this circumstance for, within that one-year period, to say we plan to list you, do you have any evidence you would like to submit?  Consider that as part of the process.  If nothing else, it would prevent some of the mistakes that were actually made on this record.

And I think the final point on vacatur, I'll just say, is that there's a lot of interesting, kind of, in our view, very post-hoc explanations for different harms that might result from vacating this decision.  None of those factual findings are in the record.  None of them -- particularly in the decision memo, in the do-over report.  And some of them just affirmatively contradict evidence that is part of the

record.

I think one example my friend on the other said gave was that, well, vacating and removing us from the list would pose dangers because our products could be used to gather intelligence from U.S. supplies.  But there's evidence that's uncontradicted in the record from a sworn declaration from our CEO and otherwise that our products have no communications capabilities.  They don't store data.  They are certified to international standards not to do that.

So I just would urge the Court, in reviewing whether the harms that the government focused on today at this hearing, to ensure that they're actually reflected in the record and not contradicted in that case.

So with no further questions from Your Honor, we do think this is a vacatur case.  We think the company has been on this list for a year now, notwithstanding the fact that it has pursued diligently the chance to get off the list and had to sue just to get the basis for the listing.  It's never had due process protections.  We think, given the lack of a contribution to the defense industrial base, that can be the end of the matter and we urge you to, therefore, vacate.

THE COURT:  Thank you.

MR. TYSSE:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Riess, I don't want to give you another bite at the apple, but I have one question,

and that question relates to one of the last points that Mr. Tysse made.

You said the *Defense One* article is the only thing that the Department of Defense relies on, but it's not even mentioned in the September 2024 decision.

MR. RIESS:  I respectfully will state that's incorrect.  So as we explained when we provided the -- when we filed the amended administrative record here, what happened was the report that forms the basis for the DoD's findings lists out all of what we've been talking about -- contributes to the Chinese industrial base and the four prongs -- it lists out the findings and then it has end notes containing all of the sources for those findings.

When the report here was being finalized, that end note for Defense -- the Defense One article was mistakenly omitted.  So, as we explained, we rectified that.  So it's incorrect to say that the Defense article, One article, was not a source for the DoD's findings.  It's strictly correct to say that it was not in the end note to the report.  But, for the reasons we explained, that was only due to an administrative error and so it did form part.

THE COURT:  So basically, it's not mentioned in the text of the September 2024 decision or in the end notes, but it was relied upon?

MR. RIESS:  It was relied upon and it was basically a

scrivener's error that it was not in --

THE COURT:  And the declaration --

MR. RIESS:  Precisely.

THE COURT:  -- says that.  Okay.

MR. RIESS:  Thank you, Your Honor.

THE COURT:  Anything else you want to say, Mr. Tysse?

MR. TYSSE:  No, Your Honor.  Thank you.  Unless you have any questions?

THE COURT:  No.  So let me say this:  First of all, I said at the outset, this is a very interesting case.  Secondly, I want to thank both counsel for really doing an excellent job today and being prepared and responsive to my questions.  The oral argument is really helping me to think about the important issues in this case.  And I will -- I spent a lot of time preparing in advance, but I need to do some more thinking and revisit your arguments today and certain parts of the briefs and the record, and you'll hear from me eventually.  Thank you.

*   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER


I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 22nd day of March, 2025


_____

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C.  20001